Argued and submitted January 12, 1999, decision of the Court of Appeals affirmed, judgment of the circuit court reversed, and case remanded to the circuit court for further proceedings November 17, 2000

Nancy R. JENNINGS,
*Respondent on Review,*

*v.*

BAXTER HEALTHCARE CORPORATION,
a Delaware corporation,
and Baxter International Inc.,
a Delaware corporation,
*Petitioners on Review,*

*and*

DOW CORNING CORPORATION,
and Willamette Falls Hospital,
*Defendants.*

(CC A 9405-03148; CA A92690; SC S45239)

14 P3d 596

Jonathan M. Hoffman, of Martin, Bischoff, Templeton, Langslet & Hoffman LLP, Portland, argued the cause and filed the briefs for petitioners on review.

Linda K. Eyerman, of Gaylord & Eyerman, P.C., Portland, argued the cause and filed the briefs for respondent on review. With her on the briefs was Kathryn H. Clarke, Portland.

David B. Smith, Tigard, and Martin S. Kaufman, of Atlantic Legal Foundation, New York, filed briefs on behalf of *amici curiae* Robert K. Adair, Bruce N. Ames, Patricia A. Buffler, Michael Gough, Joshua Lederberg, Rodney Nicholas, Robert Nolan, Dimitrios Trichopoulos, M.D., Arthur Canfield Upton, James D. Watson, James D. Wilson, and Richard Wilson.

Paul A. Cooney, of Cooney & Crew, P.C., Portland, filed a brief on behalf of *amicus curiae* Oregon Medical Association.

Roy Pulvers, of Lindsay, Hart, Neil & Weigler, LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

R. Daniel Lindahl, of Bullivant, Houser, Bailey, Portland, filed a brief on behalf of *amici curiae* Defense Research Institute and International Association of Defense Counsel.

William B. Crow, of Miller, Nash, Weiner, Hager & Carlsen LLP, Portland, filed a brief on behalf of *amicus curiae* Product Liability Advisory Council, Inc.

David F. Sugerman, of Paul & Sugerman, PC, Portland, and J.P. Toby Graff, of Graff & O'Neill, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers' Association.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

In this product liability action, plaintiff appeals from a defense verdict. She alleges that she was exposed to silicone from breast implants that leaked and ruptured, causing her personal injuries. The Court of Appeals reversed and remanded for a new trial, holding that the trial court committed reversible error in excluding certain opinion testimony of plaintiff's expert witness. *Jennings v. Baxter Healthcare Corp.*, 152 Or App 421, 954 P2d 829 (1998). Defendants seek reversal of the Court of Appeals' decision and reinstatement of the trial court's judgment. For the reasons that follow, we affirm the decision of the Court of Appeals.

### I.   FACTS

In 1978, plaintiff received silicone gel breast implants following a bilateral mastectomy.[1] Both implants partially deflated: the first in 1980 (which was replaced), the second in 1992. In 1993, plaintiff had the implants surgically removed, at which time it was discovered that one implant had ruptured. Plaintiff filed this action in 1994, alleging that silicone from the implants had migrated throughout her body and caused personal injuries. Defendants maintained that plaintiff's symptoms were caused by fibromyalgia and were not the result of the breast implants.[2]

At trial, plaintiff called Dr. Grimm to testify about medical causation. Grimm is a board-certified neurologist with an advanced degree in neurophysiology.[3] Defendants

---

[1] The breast implants were manufactured and sold by Heyer-Schulte, a division of American Hospital Supply Corporation (AHSC). Dow Corning supplied Heyer-Schulte with the silicone material. In 1984, AHSC merged into the Baxter Healthcare Corporation and Baxter International, Inc. Willamette Falls Hospital performed a mammogram on plaintiff that allegedly caused one implant to deflate partially. Plaintiff originally brought claims against the Baxter entities, Dow Corning, and Willamette Falls Hospital. Before trial, the court dismissed Dow Corning and Willamette Falls Hospital from the case.

[2] Fibromyalgia is "chronic pain in muscles and soft tissues surrounding joints." *Taber's Cyclopedic Medical Dictionary*, 728 (17th ed 1993). Defendants' expert diagnosed plaintiff with fibromyalgia. He explained that "[f]ibromyalgia is what we call a generalized pain condition * * * marked by generalized aching. It's not just localized, but tends to be aching all over."

[3] Neurology is "[t]he branch of medical science concerned with the various nervous systems (central, peripheral, and autonomic, plus the neuromuscular

did not question Grimm's qualifications to determine the causes of neurological deficits in patients in general, but did challenge Grimm's opinion testimony regarding causation in this case. In response to defendants' admissibility challenge, the trial court conducted an *in limine* hearing as directed by *State v. O'Key*, 321 Or 285, 307 n 29, 899 P2d 663 (1995).[4]

At the hearing, Grimm testified that he became interested in the neurological consequences of silicone in 1993, when he examined "two very sick women." As a result, he began to examine women who had silicone breast implants. At the time of plaintiff's trial, he had examined about 50 women, 45 of them in 1994.

Grimm testified that, among the women he had examined, he found

"a unique pattern that I had never seen in any other neurologic disease in this sample of women. Basically two features. One was that they were all relying on vision for their balance, because there was something wrong with their inner ear in the absence of the usual things of trauma, concussions, tumors, infections, genetic histories, et cetera.

"And the second thing was that while all of them had— I can't say all, but we'll say 95 percent—had patterns and complaints of tingling in their fingers and so forth, most of them were unaware that there was a loss of sensation, actual physical loss of sensation to touch, in their fingers and toes."

---

junction and muscle) and its disorders." *Stedman's Medical Dictionary*, 1202 (26th ed 1995). Neurophysiology is the physiology of the nervous system. *Id.* at 1204.

[4] In *O'Key*, the court stated that, "[w]hen proffered scientific evidence raises issues of scientific validity, those issues should be addressed by the trial court in a separate OEC 104(1) hearing, preferably in advance of trial." 321 Or at 307 n 29. OEC 104(1) provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

Under OEC 104(1), the trial judge must decide whether the proffered evidence satisfies the minimum threshold of relevance required by OEC 401. OEC 401 requires a very low threshold of relevance. "Evidence that increases, even slightly, the probability of the existence of a material fact is relevant evidence." *State v. Lyons*, 324 Or 256, 270, 924 P2d 802 (1996).

Grimm found that 43 of the 45 women he had examined in 1994 had vestibular difficulties:[5]

> "*I had never seen in my career widespread neurologic disorders, or read about as a neurologist this—what I thought was a unique pattern.* When 45 women come in, they're sent to me from different places, and they have different implant stories, different health histories, different physical troubles, past histories, and so forth. *And the unique thing was that there was an extraordinarily high correlation, 95 percent had the combination of unusual sensory patterns and the inner ear.*"

(Emphasis added.) Grimm further testified that the pattern he had observed in the women was distinguishable from a cross section of the population at large. He indicated that the combination of the two conditions is extremely rare, even among people with neurological disorders. Grimm acknowledged that his findings had not been published in any medical literature or subjected to peer review.

Grimm examined the women in his study as follows: First, he performed "a classic neurologic examination." That is, he mapped the areas where the patient had lost sensation using

> "pins and brushes, with [the patients'] eyes closed, going back and forth and making marks on their skin, in exactly what areas of hands or a foot * * * where the reception was down. And I would do this in various ways to test the veracity of the patients."

Second, he sent the patients to the vestibular laboratory at Good Samaritan Hospital in Portland. That laboratory measured each woman's inner ear function. With some of the women, Grimm had additional tests performed.

---

[5] Grimm testified that the word "vestibular" refers to part of the inner ear: "The inner ear is divided into two parts: one, the balance part, the vestibular part; the other is the hearing part."

In an attempt to determine the cause of the women's symptoms, Grimm then performed a differential diagnosis.[6] In a differential diagnosis, a doctor develops a list of all diseases that might cause a patient's symptoms and then, by a process of elimination, narrows the list. Mary Sue Henifin, Howard M. Kipen, and Susan R. Poulter, *Reference Guide on Medical Testimony*, 463, in Federal Judicial Center, *Reference Manual on Scientific Evidence* (2d ed 2000) (hereinafter *Reference Guide on Medical Testimony*). Grimm also examined the women's histories and possible exposures for other causes of the same symptoms. Silicone was the only common exposure he found among the women. Grimm also considered the research of others on animals.

Respecting Grimm's ultimate conclusions about medical causation, plaintiff's counsel asked:

"* * * [H]ave you limited your involvement and workup and conclusions that you would express today to your field of expertise—that is, to say, neurology—and drawing conclusions about the relationship between silicone exposure and the neurological ramifications of these women's health?

"A. Yes."

Plaintiff's counsel then introduced the subject that lies at the heart of this case, *viz.*, Grimm's opinion as to the cause of plaintiff's condition:

"Q. *And have you formed an opinion to a reasonable medical probability based on established and accepted medical and scientific methodologies that silicone has caused a condition in these women?*

"A. *Yes. I think there's unquestionably a very strong correlation.* What I don't understand is the mechanism yet. That, I'm working on. I cannot say that I have got to that point in my work, that I understand the mechanism. It's unquestionable about the association in these patients with their unusual neurological picture.

---

[6] Differential diagnosis is:

"[t]he determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of clinical findings."

*Stedman's Medical Dictionary* at 474.

"Q. Are you in a position, then, based on your work and the application of scientific methodology, to express opinions based to a reasonable scientific probability, one, that a silicone-related neurological condition exists?

"A. Yes.

"Q. And, two, based on your evaluation of [plaintiff], she has the signs and symptoms of such a condition?

"A. Oh, yes. Easily."

(Emphasis added.) It appears that plaintiff's counsel intended the foregoing exchange to be—and that the trial judge and defendants accepted it as—a statement that, in Grimm's opinion, plaintiff's condition was caused by the ruptured silicone gel breast implants.

The trial judge then examined Grimm. The judge apparently had understood Grimm to have testified that the conditions he had observed in the women were not proved by any scientific study. Grimm clarified that point:

"Oh, we have elegant proof of the involvement of the eighth nerve, which is the inner ear, and I'm doing the science right now. I haven't published it yet, because I'm waiting to take a two-year look at this whole problem.

"You couldn't ask for better—for better proof or better science at the present time with respect to inner ear function.

"What I don't understand yet is the mechanism for the other half of the equation, is the sensation."

The judge asked Grimm whether his technique could be "tested." Specifically, the judge asked whether Grimm had used a questionnaire because, "if [you] have a questionnaire, they can look at that and see if you asked the right questions and what answers you got." Grimm responded that he had not used a questionnaire, but that he had used the "classic technique" of "taking a careful clinical history."

The judge asked Grimm whether he had submitted his notes and documentation for peer review. Grimm responded that

"[t]hese are studies in progress. I have not submitted this for publication, at which time a very—as you can understand, a critical review goes with a jury of my peers, on whether or not I have followed this very first rule of all clinical examinations."

The judge asked Grimm whether his technique had a known or potential rate of error. Grimm responded that the potential error rate appeared to be about five to seven and one-half percent. According to Grimm, the laboratory data on balance was "the best data in the world on measurement error in this business."

The judge asked Grimm about "the degree of acceptance in the relevant scientific community, widespread acceptance of your particular theory or technique." Grimm responded:

"I have no theory at the present time, and I haven't published a thing yet. I'm still in my—the studies are in progress. And I haven't—I presented this at a science fair from my own institution, which is sort of an annual program for work in progress, but I have not yet presented this data yet, because it's not complete, to any scientific meeting."

The judge then asked Grimm about his sample group. Grimm noted that most of the 45 women he had examined had been referred to him by rheumatologists and immunologists who suspected neurological problems. About 25 percent were referred to him by attorneys. Grimm stated: "They were sent to me very specifically. It's a very biased sample of people."

The judge asked Grimm how he knew that the women were distinct from a cross section of the general population. Grimm responded that, in his practice, he had examined "maybe 10,000 individuals for neurologic diseases." He added that he sees only patients "who complain if something is going wrong with their machinery, in terms of balance or vision or whatever, that has to do with the nervous system." Generally, his patients have severe problems; general practitioners see patients with lesser problems.

Finally, the judge questioned Grimm about his use of the word "condition," rather than the word "disease." Grimm explained:

"I think it's probably best to err on the conservative side of things. In the first stages of any observations, the first stage of science, is just to write down what you see and what you hear and what the evidence is, make as careful observations as you can and leave off the words that sort of prejudge, like a 'disease.' If somebody has been intoxicated with somebody [*sic*] and has a set of neurologic symptoms and you take the thing that's intoxicating them and it gets better, you might not call it a disease but a disorder, dysfunction, or something like that. And I try to not use the emotional labels on it. A lot of those labels will prejudge a situation."

Plaintiff's counsel then examined Grimm:

"Q.　* * * [t]he methodology that you've employed in addressing questions for these 50 or so women, is all of that work based on generally accepted scientific principles and medical principles?

"A.　I believe so, yes.

"Q.　Is all of your examination technique based on standard neurological examination technique?

"A.　Yes.

"Q.　Is all of your sorting out and correlating and identifying of patterns and ruling out of other explanations based on standard medical and scientific principles?

"A.　Yes.

"Q.　So with respect to the route you've taken and the means you've used to get to your conclusions, you have no trouble saying that that is all based on accepted theory and technique?

"A.　No."

After extensive discussion with counsel, the trial judge announced his ruling:

"I don't have a problem with [plaintiff's] theory that [*State v. O'Key*, 321 Or 285, 899 P2d 663 (1995)] doesn't

apply to medical doctors who are coming in and giving a diagnosis based on their specialty.

"To the extent, however, that the diagnosis involves a new but unproven theory—proven, that is, by the *O'Key* methods—not necessarily because the doctor says. It's proven to him—*O'Key* says let's check it out. Has there been peer review? Has there been a methodology compared to samples? Has there been an error study done, so we know at least there's a possibility of error? Just seeing the 43 out of 45 doesn't mean that it's an absolutely perfect study. \* \* \*

"*[Grimm] can obviously say what he saw, and he can say that he's noticed a strong correlation between what he saw with [plaintiff] and what he has seen with some of his patients who have had silicone implants, multiple implants,* and to that point I'm not seeing a serious problem.

"As soon as he takes it a step further and it looks like to the jury that there is a disease out there called silicone-related disorder and she has it, I'm a little bit concerned, because I don't see the *O'Key* test met, particularly when the doctor talks in terms of correlation. When he says it's a condition, not a disease, and you are asking him causation and he's explained to me why it's a condition at this point, because he doesn't want to use the word 'disease' until he's further on in the studies—"

(Emphasis added.) At that point, counsel interrupted the judge and the judge did not complete his thought.

The judge then continued:

"*[Grimm] can testify to his observations of symptoms in [plaintiff].* He did examine her. I'll certainly take his word that he did a history; that he does, in his clinical practice that is an accepted method, a thorough history, did it orally without using a questionnaire, but I have no reason to doubt his ability to do it or his statement that it's a history that is well-accepted within certainly the neurological community.

"But he said he finds—once he checked those symptoms out and because he's seen similar symptoms in 45 of his 10,000 patients, he sees a pattern, and the last women he saw have had silicone implants. He sees the correlation, a

strong correlation between those two symptoms, the pattern of those two symptoms and women who have had—or at least the 45 women who have had breast implants.

*"But that's as far as I think he can go. To say that it's a cause of a disease that's undefined—well, it isn't even a disease. Dr. Grimm can't say it's a disease—and he doesn't yet understand the mechanism. Someday he will, but he doesn't yet understand the mechanism. I just don't think he can go any further than that."*

(Emphasis added.)

Plaintiff's counsel asked the judge whether Grimm could opine that, more probably than not, plaintiff's two symptoms were caused by silicone. The judge answered:

*"No, I don't think he can say that.* I think he can say—I think he can say what he did say. He did say in his diagnosis that *there appears to be a strong correlation* between women who have had silicone implants—at least these last few women he's look[ed] at—women who have had silicone implants, there's a strong correlation, and these two symptoms, and he doesn't understand the mechanism of it, but between these symptoms, he's qualified to say that. That's what he did say. I don't have a problem with that.

*"But to stretch him and make it a causal—use that word,* 'There is such a thing as silicone-related disorder. I've examined [plaintiff] and she has silicone-related disorder based on my evaluations'—*I don't think he needs to go through the* O'Key *test as a medical doctor, but when he takes that one extra step and says, 'What I observed in the symptoms belongs to this category,' when he says, 'So far it's not a disease,' and so far he's still checking out things like error, peer review, things like that that still haven't happened, I think it would be inappropriate."*

(Emphasis added.)

Plaintiff's counsel continued:

"I think what Dr. Grimm can do, and maybe we didn't really get to this point clearly, you know, he can say, 'I see this correlation,' but then—if in terms of what will—then 'Do you think that silicone is causing [plaintiff's] case,' he would say that 'I put 25 or 30 possible causes on my differential, and I have systematically ruled them out and the

only one that's left is silicone exposure.' And that, of course, makes it consistent with—I mean, the correlation, then gives me the support. So there's actually two factors."

The judge responded:

"As long as we don't get to the point that anyone mentions the word 90 or 95 percent type of thing, because that's only with these 45 women. It's not with all of the patients he has seen who have had whatever. I don't want the jury to believe that somehow this is a magic number, because I'm pretty certain it isn't.

"* * * * *

"At some point I don't mind getting the fact in front of the jury that I just mentioned, that small-level fact, and they can draw whatever inferences you argue to them or what they draw on their own.

"What I don't want to have happened is placed for them as a fact, by way of opinion, that based on the preliminary methods and the preliminary work that Dr. Grimm has done so far, he's in it for the Nobel Prize, and discovered a new disease and she has it.

"*There may come someday where there are established epidemiological studies and enough experts that can tie this and somebody can say it's a cause.* I'm just a little concerned—I mean, if you say, to a reasonable medical probability or scientific probability, is there a correlation between what you observed in [plaintiff] and a response to silicone, or something of that nature, I think I could be comfortable with that. A correlation is what he said. You can still use the reasonable medical probability if he's talking as a doctor doctor, and I think he is, because if we say scientifically probable, we trigger *O'Key*."

(Emphasis added.)

Plaintiff's counsel continued:

"[Grimm] is here, first and foremost, as a medical doctor."

The judge responded:

"Okay. So if you say, 'Doctor, to a reasonable medical probability, the symptoms that you have diagnosed in [plaintiff], you say to a reasonable medical probability

there's a strong correlation between those symptoms and silicone'—now, I may revise that in * * * a minute, but that sounds like something that I could deal with. He's not using the word 'cause,' he's not say[ing] 'the studies show' and he's not saying silicone-related disorders, but you said silicone exposure—*there's a strong correlation between the symptoms he's found and exposure to silicone, now that I think he can say*, and I think * * * it will stand the test.

"But if you get too much further out of that, I'm going to be real concerned, because *I do see somewhere a bright line where we get beyond his medical diagnosis into where he's given a scientific opinion as to the fact of silicone-related disorder and a direct causation of that disorder when we're so preliminary at this point.*"

(Emphasis added.)

Plaintiff's counsel then asked:

"What you're saying is he can say more probably than not there's a correlation, but he can't say more probably than not this is the cause—

"THE COURT: Yeah. I think I could—

"[Plaintiff's Counsel]: —to a reasonable medical probability?

"THE COURT: —to a reasonable medical probability. And I would let you lead on that point so that we don't go jumping around."

In response to a request by defense counsel for cross-examination, the trial judge stated, in part:

"[W]e've got a potential of an opinion crossing a discipline from medical into more or less a scientific certainty. I think we're stopping short of that, and I think it's all right."

As noted, the jury returned a verdict for defendants, and the trial court entered judgment accordingly. Plaintiff appealed, assigning as error, *inter alia*, the trial court's ruling excluding Grimm's causation testimony.

The Court of Appeals reviewed the trial court's ruling as a matter of law and concluded that the trial court erred when it excluded Grimm's opinion testimony about causation. *Jennings*, 152 Or App at 429. The court explained:

"Whether Grimm's hypothesis is correct was a question of fact for the jury to decide in connection with the other evidence on the issue. In sum, we hold that Grimm's opinions meet the threshold requirement of logical relevance and that [defendant's] arguments go to the weight of the evidence and not to its admissibility. We conclude that the trial court erred when it excluded Grimm's opinion on causation.

"* * * * *

"[W]ithout Grimm's testimony as to the causation for the neurological disorders, plaintiff may have been unable to effectively rebut [defendant's] theory of the case that she suffered from fibromyalgia.

"In summary, the issue of causation was strongly contested throughout the trial with experts differing about whether the silicone that leaked from the implants was capable of causing plaintiff's complaints. The trial court's ruling effectively prevented plaintiff from offering testimony from a key witness about the issue of causation and that ruling may have affected the jury's view of the rest of plaintiff's evidence in light of the requirement that plaintiff had to prove her allegations by a preponderance of the evidence. On this record, we cannot say that there is 'little likelihood' that the trial court's ruling affected plaintiff's case, and we conclude that a new trial is necessary."

*Id.* at 430-31.

## II.   DISCUSSION

### A.   *Standard of Review*

■      At the threshold, we must determine the standard of review. Defendants argue that this court should review the trial court's ruling for an abuse of discretion.[7] Plaintiff argues that the question whether scientific evidence is admissible is reviewed for errors of law. We agree with plaintiff.

In *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), this court considered whether polygraph evidence was

---

[7] That is the approach currently being taken in federal courts. *See, e.g., General Electric Co. v. Joiner*, 522 US 136, 143, 118 S Ct 512, 139 L Ed 2d 508 (1997) ("admissibility of expert testimony * * * is reviewable under the abuse-of-discretion standard").

admissible. The court concluded that, "[n]otwithstanding the usual deference to trial court discretion, we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code." *Id.* at 442. In *O'Key*, this court considered the admissibility of the horizontal gaze nystagmus (HGN) test to show that a defendant was intoxicated. The court stated that "[t]he validity of proffered scientific evidence * * * is a question of law * * *." 321 Or at 309 n 35. The *O'Key* court explained:

"Although this court typically is deferential to a trial court's findings of preliminary facts under OEC 104(1), good reasons exist to modify this approach in the context of scientific evidence. Unlike almost all other preliminary fact questions made under OEC 104(1), a large component of the decision surrounding scientific evidence transcends individual cases. In the usual application of OEC 104(1), a trial court must make a context-specific factual determination. For example, a trial court must find by a preponderance of the evidence that a conspiracy existed before admitting evidence under the exemption from the ban on hearsay for statements made by a co-conspirator, OEC 801(4)(b)(E), and the trial court must similarly find that a hearsay declarant is 'unavailable' under OEC 804(1) for purposes of the statement against penal interest exception to the hearsay rule, OEC 804(3)(c). Because those preliminary facts are specific to the case before the trial court and do not repeat themselves in the same form in other cases, substantial deference to the trial court as factfinder logically flows out of the trial court's close proximity to the matter. When the preliminary facts are not case-specific, little or no deference to the trial court's findings is appropriate. The validity of scientific knowledge does not change from court to court; assessment of that knowledge should not change from court to court.

"Moreover, if evidentiary rulings as to the admissibility of scientific evidence are reviewed with deference to trial court discretion, inconsistent decisions concerning the admissibility of scientific evidence may go unchecked from one trial court to another. Such inconsistency may confound efforts to provide uniformity under the Oregon Evidence Code."

*Id.* at 320 n 45 (citations omitted). *See also State v. Rogers*, 330 Or 282, 308-15, 4 P3d 1261 (2000) (reviewing ruling that

expert witness was not qualified to testify about possible causes of the defendant's frontal lobe dysfunction for errors of law). Accordingly, we review the trial court's ruling on Grimm's testimony for errors of law.

## B.  *Admissibility of Scientific Evidence*

■        In *Brown*, this court abandoned special tests for the admissibility of scientific evidence in favor of resolving the problem by relying on traditional evidence law as codified in the Oregon Evidence Code. 297 Or at 408. The admissibility of scientific evidence implicates three provisions of the evidence code. OEC 401 defines relevant evidence as

> "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

(Emphasis added.) OEC 702, which sets the standard for admission of scientific evidence, provides:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

OEC 403 permits the trial court to exclude relevant evidence

> "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

According to *Brown*, expert testimony is admissible if it is relevant under OEC 401, would assist the trier of fact under OEC 702, and is not subject to exclusion under OEC 403. 297 Or at 409.

Scientific evidence

> "draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy."

*Id.* at 407-08. This court also held:

> "In applying OEC 401, 702 and 403, this court must identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission."

*Id.* at 409.

The *Brown* court instructed:

> "In determining whether scientific evidence is probative under OEC 401 and the relevancy and prejudice analysis implicated in OEC 702's helpfulness standard, we believe [that seven factors] * * * provide structure and guidance * * *."

*Id.* at 417. Those factors are:

> "(1)  The technique's general acceptance in the field;
>
> "(2)  The expert's qualifications and stature;
>
> "(3)  The use which has been made of the technique;
>
> "(4)  The potential rate of error;
>
> "(5)  The existence of specialized literature;
>
> "(6)  The novelty of the invention; and
>
> "(7)  The extent to which the technique relies on the subjective interpretation of the expert."

*Id.* at 417.[8] Those seven factors are not an exclusive checklist. Rather,

---

[8] In a footnote, the *Brown* court listed 11 additional factors that the court may consider:

> "(1)  The potential error rate in using the technique;
>
> "(2)  The existence and maintenance of standards governing its use;
>
> "(3)  Presence of safeguards in the characteristics of the technique;
>
> "(4)  Analogy to other scientific techniques whose results are admissible;
>
> "(5)  The extent to which the technique has been accepted by scientists in the field involved;
>
> "(6)  The nature and breadth of the inference adduced;
>
> "(7)  The clarity and simplicity with which the technique can be described and its results explained;
>
> "(8)  The extent to which the basic data are verifiable by the court and jury;
>
> "(9)  The availability of other experts to test and evaluate the technique;
>
> "(10)  The probative significance of the evidence in the circumstances of the case; and

"[t]he existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."

*Id.* at 417-18 (footnotes omitted).

■     As noted in *O'Key*, a court should evaluate evidence that purports to be scientific to ensure that it is scientifically valid:

"Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation. This approach 'ensure[s] that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science.'"

321 Or at 291-92 (footnote and citations omitted).

C.   *Application of Legal Principles to this Case*

■     Plaintiff argues that the *Brown* and *O'Key* standards for admission of scientific evidence should not apply to Grimm's testimony, because his testimony "does not involve the application of scientific tests or statistical calculation, such as polygraph machines or DNA testing, where concerns regarding unfair prejudice and usurpation of the jury's role require a showing of scientific reliability of an expert's underlying methodology or process." Plaintiff's concerns might be appropriate in determining to what extent to apply the

"(11) The care with which the technique was employed in the case."
*Brown*, 297 Or at 417 n 5. In *O'Key*, 321 Or at 306 n 28, the court recognized additional factors that may be considered in determining the admissibility of proffered expert scientific testimony.

*Brown* and *O'Key* factors. *See O'Key*, 321 Or at 305 (multifactor inquiry is flexible; ultimate concern is scientific validity); *Brown*, 297 Or at 417 (factors "provide structure and guidance," but are not a checklist). However, plaintiff's concerns do not place Grimm's testimony entirely beyond the reach of *Brown* and *O'Key*. A jury is likely to believe that a doctor's testimony about medicine is a scientific assertion and, therefore, the proponent of the testimony must show that it is scientifically valid.

Evidence is scientific when it "draws its convincing force from some principle of science, mathematics and the like." *Brown*, 297 Or at 407. "Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation." *O'Key*, 321 Or at 292. Expert testimony regarding scientific evidence must bear a valid connection to the pertinent inquiry. The reliability of such expert testimony turns on whether it is scientific knowledge, which is determined by evaluating its scientific validity.

Clinical diagnoses bear the marks of science. A medical doctor gathers information from a patient to develop a working diagnosis (a hypothesis), then uses that working diagnosis to gather further information or to specify tests that will confirm or refute the working diagnosis. *Reference Guide on Medical Testimony* at 463-64.

> "The goal of the clinician is to arrive at a diagnosis that can be used to develop a rational plan for further investigation, observation, or treatment, and ultimately to predict the course of the patient's illness * * *. To do this, the clinician must verify or validate the diagnostic hypothesis."

*Id.* at 464. *See also O'Key*, 321 Or at 292 ("The scientific method is a validation technique, consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses.").

This court previously has indicated that scientific evidence is subject to the requirements of *Brown* and *O'Key*, even though the science involved is not "hard" science. The

*O'Key* court held that the state's evidence in that case was scientific, because it involved the premise that alcohol affected the automatic tracking mechanisms of the eyes. 321 Or at 295; *see also State v. Milbradt*, 305 Or 621, 630-31, 756 P2d 620 (1988) (psychological syndrome evidence is a form of scientific evidence).

■ The question in this case is whether Grimm was entitled to testify about his opinion that silicone caused plaintiff's neurological conditions. In this inquiry, we focus on Grimm's methodology, not on his conclusions. *See O'Key*, 321 Or at 305 (focus must be solely on principles and methodology, not on the conclusions that they generate). After reviewing the record in this case, we conclude that Grimm's methodology was scientifically valid. Thus, Grimm was entitled to offer his opinion.

The process of determining whether a substance causes a disease overlaps numerous areas of study. Epidemiology[9] is informed by clinical medicine:

> " 'While epidemiologic information is at times derived from a much wider spectrum of biologic and medical disciplines, these three—*clinical medicine*, pathology and biostatistics—have almost universal application in epidemiology. Indeed, epidemiology may be thought of as the joint application of the three in the search for further understanding of disease etiology.' "

George W. Conk, *Against the Odds: Proving Causation of Disease with Epidemiological Evidence*, 3 Shepard's Expert and Sci Evidence Q 103, 120 (Summer 1995) (quoting Brian McMahon and Thomas F. Pugh, *Epidemiology, Principles and Methods* (1970)) (emphasis added).

Case reports based on clinical observations have recognized value in epidemiological research:

> "Case reports lack controls and thus do not provide *as much* information as controlled epidemiological studies do.

---

[9] "Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations." Michael D. Green, D. Michal Freedman, and Leon Gordis, *Reference Guide on Epidemiology*, 335, in *Reference Manual on Scientific Evidence* (hereinafter *Reference Guide on Epidemiology*).

However, *case reports are often all that is available on a particular subject* because they usually do not require substantial, if any, funding to accomplish, and human exposure may be rare and difficult to study. Causal attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of other information available, including toxicological data."

*Reference Guide on Medical Testimony* at 475 (emphasis added; footnotes omitted).

"There plainly is a hierarchy to these different indirect forms of toxic effect evidence. Epidemiology is at the top, and structural similarity, in vitro testing, and case reports are at the bottom. Yet any one of these forms of evidence may have some utility in attempting to ascertain whether a causal connection exists."

Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of* Agent Orange *and Bendectin Litigation*, 86 Nw U L Rev 643, 658 (1992). An opinion drawn from only case reports can be troublesome, because it involves *post hoc, ergo propter hoc* (after this, therefore because of this) reasoning:

"[S]ome children who live near power lines develop leukemia; but does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children who have minimal exposure to such fields. It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the disease, the rate should be higher among the exposed, lower among the unexposed."

David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, 91, in *Reference Manual on Scientific Evidence* (footnote omitted). However, case reports sometimes are sufficient in and of themselves to establish causation. "Occasionally, when the effect of the agent is powerful enough, scientists will tentatively accept case reports as sufficient to establish a causal relation." Green, 86 Nw U L Rev at 658. Such was the case with the drug Thalidomide, which caused an enormous increase in birth defects. *Id.* at 658 n 68.

The Vaccine Safety Committee of the Institute of Medicine, National Academy of Sciences, also confirms that case reports may serve as a basis for finding causation:

"Although *Can It?* causality is usually addressed from epidemiologic studies, an affirmative answer can occasionally be obtained from individual case reports. Thus, if one or more cases have clearly been shown to be caused by a vaccine (*i.e., Did It?* can be answered strongly in the affirmative), then *Can It?* is also answered, even in the absence of epidemiologic data. *In several circumstances, for example, the committee based its judgment favoring acceptance of a causal relation solely on the basis of one or more convincing case reports.*"

Kathleen R. Stratton, Cynthia J. Howe, and Richard B. Johnston, Jr., eds., *Adverse Events Associated with Childhood Vaccines: Evidence Bearing on Causality*, 22 (1994) (last emphasis added).

On this record, the "testability," or "falsifiability," factor is met.[10] Any scientist can check Grimm's testing methods and the clinical history of each of his patients. Moreover, Grimm's results also can be tested (another neurologist could test women with silicone breast implants to see if they had the same neurological conditions identified by Grimm). Grimm's hypothesis is capable of being falsified; that is, evidence may be introduced to disprove his hypothesis. *See O'Key*, 321 Or at 303 (science is based on testing hypotheses to see if they can be falsified).

■    Although Grimm's hypothesis has not been tested by others, that is, in part, because his work is new. OEC 702 does not preclude the admission of novel scientific evidence. If it is otherwise scientifically valid, a novel conclusion is admissible. *O'Key*, 321 Or at 302.

"The chief difficulty with novelty as a limitation is * * * that it too strongly suggests a focus upon the subject matter of the testimony as opposed to the real matter of concern,

---

[10] One of the factors mentioned in *Brown* is the availability of other experts to test and evaluate the technique. 297 Or at 417 n 5. The United States Supreme Court has used the terms falsifiability, refutability, and testability. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 593, 113 S Ct 2786, 125 L Ed 2d 469 (1993).

the particular general propositions relied upon by the witness."

*O'Key*, 321 Or at 293 n 9 (quoting John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev 349, 367 (1992)).

Grimm testified that he performed "a classic neurological examination" on each of the women in his study group. Grimm's hypothesis is based on his own experiences and observations, as well as on scientific methodology. It was tested by his evaluation of about 50 patients, most of whom exhibited "unique" symptoms and conditions similar to those of plaintiff. All had been exposed to silicone from breast implants. Grimm conducted his evaluations by using neurological examination techniques generally accepted by the scientific community and with an error rate of five to seven percent. In each case, Grimm made personal observations and conducted a medical record review. He proceeded in conjunction with other specialists involved in the women's care. Grimm also studied the scientific and medical literature about silicone-related subjects.

Grimm eliminated other potential causes of plaintiff's conditions through differential diagnosis, which is a generally accepted form of scientific inquiry.

The trial judge expressed concern that Grimm had not used a questionnaire. A medical doctor does not need to use a questionnaire to develop a patient's clinical history. In allowing Grimm to testify at length about his study, the trial judge at least implicitly recognized that fact.

■ Grimm's study and conclusions had not been subjected to peer review and had not been published. However, neither peer review nor publication is a *sine qua non* for the admissibility of scientific evidence. *See O'Key*, 321 Or at 304 ("In some cases valid but innovative theories or propositions will not have been published, either because they are too particular, too new, or of limited interest."). Publication or lack thereof in a peer-reviewed journal is a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion

is based. *Id.* The study underlying Grimm's opinion about causation had not been accepted by the scientific community, but that is not to say that the scientific community had rejected that study.

■        A conclusion about causation ultimately is a qualitative decision. *See, e.g., Reference Guide on Epidemiology* at 375 ("While the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using scientific methodology."). The rate-of-error factor does not always require the introduction of statistical evidence. *See O'Key*, 321 Or at 313 (concluding under that factor that the HGN test is "a fairly reliable indicator of alcohol impairment"); *cf. Brown*, 297 Or at 433 and 438 (polygraph evidence was probative despite fact that there could be no judgment of validity or potential rate of error).

The trial court expressed concern that Grimm could not explain the mechanism causing "patterns and complaints of tingling in [the] fingers and so forth * * *" of his study group. "But," as Sir Austin Bradford Hill stated regarding the causation of disease, "this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day." Hill, *The Environment and Disease: Association or Causation?*, 58 Proc R Soc Med 295, 298 (1965). There are many generally accepted hypotheses in science for which the mechanism of cause and effect is not understood fully. Grimm's inability to explain the mechanism of plaintiff's condition goes to weight, not to admissibility.

The trial court also expressed concern that Grimm declined to label the two conditions that plaintiff suffered as a "disease." However, Grimm adequately explained his reluctance to label plaintiff's conditions prematurely, and his explanation in no way casts doubt on the existence of the neurological conditions that he found in plaintiff.

### III.   CONCLUSION

The question before this court on review is whether the trial court erred in prohibiting Grimm from testifying that, in his opinion, plaintiff's neurological symptoms probably were caused by silicone exposure from her breast

implants. On this record, we conclude that the court should have admitted that evidence. Grimm's methodology withstood scrutiny under the *Brown* and *O'Key* factors, and that methodology supported his proffered opinion testimony. Grimm's opinion regarding causation was relevant and probative. We reject defendant's proposed rule of law that an expert opinion on causation based on anything other than statistically significant, peer-reviewed, published epidemiological studies is inadmissible. We also agree with the Court of Appeals, 152 Or App at 430, that Grimm's opinion testimony about causation would have been helpful to the jury and that there is nothing in his excluded testimony that would have caused unfair prejudice or confusion, or that would have misled the jury.

■    In the past, this court has stated that a published decision affirming the admissibility of certain forms of scientific evidence will mean that the proponent of the evidence need not lay a scientific foundation for it again. *Lyons*, 324 Or at 280 n 31; *O'Key*, 321 Or at 293. In this case, however, our conclusion regarding the admissibility of Grimm's testimony is not necessarily binding on retrial:

> "The scientific enterprise always must remain open to reassessing the validity of past judgments as new evidence develops."

*Reference Guide on Epidemiology* at 374. Grimm admitted that his studies were not complete. In the five years that have passed since the trial, Grimm may have developed additional evidence that either confirms or refutes his earlier conclusion. At a retrial, therefore, and on appropriate motion, plaintiff may be called on to satisfy the requirements of *Brown* and *O'Key*.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.