Argued and submitted November 18, 2008, at Glencoe High School, Hillsboro, affirmed May 20, petition for review denied September 17, 2009 (347 Or 42)

Susan Lynn BLAKE,
personal representative of the
Estate of Melissa Kay Blake, deceased,
*Plaintiff-Appellant,*

*v.*

CELL TECH INTERNATIONAL, INCORPORATED,
a foreign corporation;
and The New Algae Company,
an Oregon corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
050403928; A135647

208 P3d 992

George W. Kelly argued the cause and filed the briefs for appellant.

R. Daniel Lindahl argued the cause and filed the briefs for respondents.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

This case involves the issue of whether the trial court properly excluded the testimony of plaintiff's expert witness under OEC 401, OEC 403, and OEC 702. After the trial court ruled in a pretrial hearing that plaintiff's proposed scientific evidence was not admissible, plaintiff stipulated to entry of judgment in favor of defendants, reserving her right to appeal under ORS 19.245(3).[1] We affirm.

Melissa Blake, the decedent, died in 2003 at the age of 34. Plaintiff, decedent's personal representative, brought a wrongful death and product liability action against defendants Cell Tech International and The New Algae Company—companies that manufacture and distribute a dietary supplement called Blue Green Algae. According to plaintiff, decedent consumed Blue Green Algae products manufactured by defendants, those products contained toxins called "microcystins," and those microcystins caused decedent's liver and renal (kidney) failure, culminating in decedent's death. Plaintiff alleges that defendants' products were dangerously defective and that defendants were negligent in selling them.

■■ The trial court held the pretrial hearing pursuant to OEC 104(1), which provides that

> "[p]reliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination, the court is not bound by the rules of evidence except those with respect to privilege."

Plaintiff's only witness at the hearing was Dr. Dietrich, who testified regarding the immunohistochemical (IHC) tests he performed to detect microcystin toxins in decedent's liver and kidneys. Defendants did not dispute Dietrich's qualifications;

---

[1] ORS 19.245(3) provides as follows:

"A party to a stipulated judgment may appeal from the judgment only if:

"(a) The judgment specifically provides that the party has reserved the right to appellate review of a ruling of the trial court in the cause; and

"(b) The appeal presents a justiciable controversy."

rather, they contended that his proposed testimony was inadmissible because it lacked scientific validity. Dr. Carmichael testified in support of defendants' contentions. The trial court agreed with defendants and excluded Dietrich's testimony. The question of whether evidence is admissible as scientific evidence is reviewed for errors of law. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299, 14 P3d 596 (2000). "Scientific evidence" is "evidence that draws its convincing force from some principle of science, mathematics and the like." *State v. Brown*, 297 Or 404, 407, 687 P2d 751 (1984).

We turn to the evidence adduced at the pretrial hearing. Dietrich testified that he is a professor of toxicology at the University of Konstanz, in Germany. He was trained in biology at the Technical Institute in Zurich and obtained his Ph.D. in toxicology from the Federal Institute of Toxicology. While at the Federal Institute of Toxicology, Dietrich studied microtoxins, including algae toxins. Dietrich currently does toxicology work for the Organization for Education and Development, the European Community, and the World Health Organization. Dietrich began studying microcystins in 1991 as part of an investigation of bacterial blooms associated with fish kills for the Swiss government.

At the pretrial hearing, Dietrich explained the mechanism by which microcystins can cause a person's death. After a person ingests algae containing microcystin toxins, the toxins go to the stomach and intestines, enter the blood stream, and are transported in the bloodstream to the liver, where the toxins enter the liver cells. According to Dietrich, "liver cells have an active uptake of these toxins." The microcystins then bond to cell components in the liver, inhibiting essential cell functions and causing cellular damage. The liver cells die from the cellular damage and are replaced by scar tissue, resulting in cirrhosis. Because the liver is damaged, an increased amount of proteins are released by the liver into the bloodstream. The kidneys, which reabsorb proteins from the blood, become overwhelmed by the increased amount of proteins, resulting in kidney failure, followed by death.

In addition to explaining how microcystins can cause a person's death, Dietrich explained that he used IHC tests to

detect microcystin toxins in decedent's liver and kidneys. IHC testing is a method of detecting toxins in tissue. The tissue to be tested is first coated with a primary antibody that is known to react to the toxin being tested for. If that toxin is present in the tissue, the primary antibody bonds to it. The tissue is then washed, leaving behind the primary antibody that has bonded to the toxin. If there is no toxin in the tissue sample, the primary antibody washes off. After the tissue is washed, a secondary antibody is applied. The secondary antibody recognizes and binds with any primary antibody remaining on the tissue, producing a color reaction. According to Dietrich, "only where the secondary antibody recognizes the first antibody, which recognized the toxin, is where the color reaction takes place."

Dietrich admitted during cross-examination, however, that he is the first person known to attempt to use IHC to detect microcystins in human liver tissue. He explained, "To my knowledge, this is the first time that immunohistochemistry has been used on liver sections in humans." Accordingly, Dietrich admitted there are no publications concerning the use of IHC to detect microcystins in human livers, establishing controls for using IHC to detect microcystins in human livers, listing protocols for using IHC to test for microcystins in human livers, or reporting the error rate when using IHC to test for microcystins in human livers. However, Dietrich also testified that "immunohistochemistry is a very broad and a very common methodology used broadly in clinical medicine and oncology * * * as well as in research." He noted that the use of carp liver positive controls to detect toxins has been published and peer reviewed. Additionally, he said that there are published studies where IHC has been used to detect microcystins in nonhuman liver tissue.

Dietrich performed three sets of IHC tests on decedent's liver tissue, which had been embedded in paraffin. According to Dietrich, in each of those tests he used "protocols that * * * are accepted in [the] field and approved on a peer-reviewed basis." As a "negative control," Dietrich used carp and human liver tissue that had never been exposed to microcystins. As a "positive control," Dietrich used carp liver tissue that had been exposed to microcystins. Additionally, rather than use a commercially available antibody, Dietrich

used antibodies that he had manufactured himself; he described them as antibody 824 and antibody 2. Antibody 824 is a polyclonal antibody derived from sheep. Antibody 824 responds to the Adda amino acid and detects about 80 percent of all known microcystins. Unlike antibody 824, antibody 2 is monoclonal, recognizing primarily those microcystins containing the arginine group of amino acids.

Dietrich explained that commercial antibodies are accompanied by instructions for the proper dilution ratio for the particular type of tissue to be tested because the manufacturer has already determined the proper dilution. Because Dietrich made the antibodies used in his tests, he conceded that there are no established and standardized dilution ratios for antibodies 824 and 2 for purposes of testing human liver tissue. However, Dietrich testified that the reduction of an antibody's dilution increases its sensitivity while not changing its specificity:

> "[Dietrich:]  * * * [T]he dilution of the antibody is a trade-off between the background and—and detection. If you have a very high concentration of antibody * * * you may induce a high background. If you dilute it too strongly, you may not see anything.
>
> "* * * * *
>
> "[Question:]  * * * [O]ne might think, Dr. Dietrich, that when you change the dilutions you are necessarily changing the results, either favorably toward one conclusion or unfavorably toward one conclusion. Is—is that what you are doing, or are you—or are you rather optimizing to best reveal what is there, but which is unseen with certain concentrations?
>
> "[Dietrich:]  No, this is—it is the second case."

The first set of tests was performed with the use of antibody 824 and produced a false positive.[2] Dietrich testified that, when the decedent's liver was tested without applying

---

[2] A "false positive" is defined, in part, as follows:

"**2.** An individual whose test results include him or her in a particular diagnostic group to which the individual may not truly belong. **3.** Term used to denote a false-positive *result*."

*Stedman's Medical Dictionary* 646 (27th ed 2000) (boldface and italics in original).

antibody 824 (slide A6), a slight background color change was observed. That result is problematic because decedent's liver tissue in slide A6 was not treated with a primary antibody—that is, there was no primary antibody for the secondary antibody to bond with; thus, that test should not have produced a color change. The results from the first series of tests are as follows:

| Slide # | Sample | Antibody | Result |
|---------|--------|----------|--------|
| A2 | Control—carp liver without microcystins (negative control) | 824 | No color change |
| A3 | Carp liver with microcystins (positive control) | None | No color change |
| A4 | Carp liver with microcystins (positive control) | 824 | Strong color |
| A5 | Decedent's liver | 824 | Strong color |
| A6 | Decedent's liver | None | Slight background color |
| A7 | Decedent's liver | 824 | Strong color |

Because Dietrich was not satisfied with the results from the first series of tests, he performed a second series of tests. Dietrich used both antibody 824 and antibody 2 in the second series of tests. Dietrich also added a human liver negative control—a sample of human liver that had not been exposed to microcystins—and tested decedent's kidney tissue. The results are as follows:

| Slide # | Sample | Antibody | Result |
|---------|--------|----------|--------|
| B1 | Decedent's liver | 824 | Strong color |
| B2 | Decedent's kidney | None | Strong background color |
| B3 | Human liver without microcystins (negative control) | 824 | Weak background color |
| B4 | Decedent's liver | 2 | Moderate color |
| B5 | Decedent's liver | None | No color change |
| B6 | Human liver without microcystins (negative control) | 2 | No color change |
| B7 | Carp liver with microcystins (positive control) | 2 | Strong color |
| B8 | Carp liver without microcystins (negative control) | 2 | No color change |

Dietrich was dissatisfied with the results of the second series of tests because it produced two false positives. The human negative control liver test (slide B3) produced background color, even though there were no microcystins in the tissue. And, although decedent's kidney tissue (slide B2) had not been treated with a primary antibody, it showed strong background color. Accordingly, Dietrich decided to reduce the dilution of the antibodies and run a third series of tests.

Dietrich's third series of tests also produced a false positive. Specifically, antibody 824 produced a weak background color in the human negative control liver (slide C3). Because the human negative control liver did not have any microcystins in the tissue, the secondary antibody should not have produced a color change. However, when Dietrich tested the human negative control liver with antibody 824, a weak background color change occurred. The results of the third series of tests are as follows:

| Slide # | Sample | Antibody | Result |
|---------|--------|----------|--------|
| C1 | Decedent's liver | 824 | Strong color |
| C2 | Decedent's liver | None | No color change |
| C3 | Human liver without micro-cystins (negative control) | 824 | Weak background color |
| C4 | Decedent's liver | 2 | Moderate color |
| C5 | Decedent's liver | None | No color change |
| C6 | Human liver without micro-cystins (negative control) | 2 | No color change |

Nonetheless, after the third series of tests, Dietrich testified that he was "confident that what we are seeing is positive staining for microcystins. So there must have been some microcystin exposure." Dietrich further opined that "clear evidence" demonstrated "a high amount of microcystin" and that, because the color changes in decedent's liver were comparable to the color changes in the carp tissue, it is inferable that decedent's tissue and the carp tissue had similar concentrations of microcystins. Accordingly, Dietrich concluded, "It is highly likely that [microcystin toxin] was the cause of [decedent's] death."

After Dietrich testified, defendants called Carmichael, who is considered an authority on microcystins. Carmichael, who has worked for defendants since 1995, acknowledged that IHC tests "are accepted assays." But he suggested that Dietrich performed three different sets of tests because the results were not "quite what [Dietrich] wanted" on the first and second tests, and he opined that even the third test did not produce a satisfactory result. Carmichael also criticized the accuracy of IHC testing because it requires a "subjective interpretation," and he suggested that Dietrich should have used a second method to confirm the results. According to Carmichael, analytical methods such as liquid chromatography linked to mass spectrometry or gas chromatography linked to mass spectrometry can be used to confirm the results of IHC testing, and those tests can both identify the presence of microcystins and measure the amount of microcystins in the sample tissue.

In fact, Carmichael performed those tests—liquid chromatography linked to mass spectrometry and gas chromatography linked to mass spectrometry—on decedent's tissue and did not detect any microcystins. On cross-examination, however, Carmichael admitted that the tissue that he tested had been embedded in paraffin, a substance that can nullify liquid chromatography linked to mass spectrometry's and gas chromatography linked to mass spectrometry's ability to detect microcystins:

"[Question:] You reported to Dr. Stenzel [who performed decedent's autopsy] that * * * paraffinization of the tissue here may have affected the ability to reach some results that you were trying to obtain?

"[Carmichael:] Right.

"* * * * *

"[Question:] And you say with respect to testing for microcystins, 'The results were negative. As mentioned, the liver prep very likely removed microcystin if there were measurable amounts present.' Is that what you wrote?

"* * * * *

"[Carmichael:] * * * Right.

"* * * * *

"[Question:] * * * [Y]ou are saying here [the paraffinization] very likely compromised the ability to test for microcystin?

"[Carmichael:] Yeah. We have done paraffinembedded tissues on many occasions—several occasions, fish as well. And sometimes we're able to measure it. Sometimes we're not able to measure it."

The trial court sustained defendant's objection to Dietrich's testimony, explaining its reasoning in a letter opinion:

"I construe the matter before me as a motion by defendant to preclude Dr. Daniel Dietrich from testifying about the immunohistochemical (IHC) testing he performed on the slides of liver tissue from [decedent], and his conclusion that the testing showed the presence of microcystin which was 'highly likely' the cause of her death. Defendant's motion is granted.

"The evidence proffered by plaintiff through Dr. Dietrich is indisputably 'scientific' in nature. It is therefore the responsibility of this court to ensure that it is 'supported by the appropriate scientific validation.' *State v. O'Key*, 321 Or 285, 292, 899 P2d 663 (1995). It is not the use of IHC as a methodology in general that is challenged by defendant, but rather the specific protocol (including which antibodies and stains to use, and in what dilutions) used to test human liver tissue for microcystins and reach opinions about a cause of death.

"As Dr. Dietrich testified, when antibodies are developed for use in IHC testing, the manufacturer of the antibody develops and publishes a protocol for its use in different tissue types. No such protocol has been established for the use of the antibodies developed and used by Dr. Dietrich for the detection of microcystin in human liver tissue. The three sets of tests run by Dr. Dietrich were the type of tests that scientists would conduct to find the correct balance between sufficient sensitivity and sufficient specificity as preliminary steps to establish such a protocol. (Too much sensitivity results in a high rate of false positives or too much 'background noise,' while too much specificity results in false negatives.) The three series of tests may have been the best Dr. Dietrich could do with the material that he had, but not even Dr. Dietrich suggested that the testing he had

done was sufficient to establish the reliability of the protocol used in the third series of tests.

"Dr. Dietrich acknowledged that the results of the first two sets of tests (each done with a different protocol) were not satisfactory. The third test was never replicated. Dr. Dietrich acknowledged that different types of antibodies work differently in different types of tissue in IHC testing. For example, he said that the antibodies he was using do not work well on human kidney tissue, and that the antibodies used may appear to show microcystin around the venous and arterial tissue in the liver, even when no microcystin is there (false positive). He had done no testing on human liver tissue known to have been affected by alcohol abuse.

"* * * * *

"Dr. Carmichael's testimony *was* pertinent and useful in that it established that conventional analytic methods can and had been used to detect the presence of microcystins in human liver tissue, notwithstanding their covalent bonding. Such methods were used to detect microcystins in the liver tissue of the patients who were victims of the microcystin contamination in the Caruaru dialysis center in Brazil. This establishes that conventional analytic methods could be used to confirm the accuracy of an IHC protocol.

"In short, the use of IHC to detect microcystins in human liver tissue (or to determine a cause of death therefrom) is novel, indeed it is unique to this case. The technique has not been tested or corroborated by other means. It has not been subjected to peer review or publication. The potential rate of error is unknown (although the lowest rate of error Dr. Dietrich achieved was over 16%). There are no standards governing its use. The technique relies on subjective interpretation (what is a background level and whether the staining in the subject sample exceeds that level). The nature and breadth of the inference adduced (that Melissa Blake ingested microcystin-contaminated blue-green algae products manufacture by the defendant which fatally damaged her liver) is sweeping.

"Dr. Dietrich's qualifications and stature are not in question. There is no challenge to the care with which he employed the technique in this case and no dispute that he went beyond the steps that would usually be employed in

IHC testing *if a protocol for the particular test had been established and validated.* There is no suggestion, and I certainly do not find, that the technique is 'junk science.' Perhaps if Dr. Dietrich had more time and more tissue (including liver tissue from known human chronic alcohol abusers), and he was able to perform confirmatory tests using recognized analytic methods, he could present something sufficiently reliable to be heard by a jury.

"Dr Dietrich's conclusions are central to the case and sweeping in nature. The jury would likely give them great weight because of their scientific nature and the claims that this is the type of evidence on which physicians make life-and-death treatment decisions. Plaintiff has not established that they are 'supported by appropriate scientific validation' for use at trial."[3]

(Emphasis in original.)

■■■  Plaintiff asserts that the trial court erred in ruling plaintiff's scientific evidence inadmissible. Defendants respond that "[t]he trial court correctly ruled that Dr. Dietrich's proposed testimony was not admissible because the basis for his testimony was not scientifically valid." To be admissible, expert testimony must be relevant under OEC 401,[4] must assist the trier of fact under OEC 702,[5] and must not be subject to exclusion under OEC 403[6] because its probative value is outweighed by the danger of

---

[3] Although we reach our own legal conclusion in this case based on the record before us and on our discrete analysis, the trial court's creation of the record and its explanation of its ruling have facilitated our review function of a complex issue. We commend the trial court's handling of this matter as a model to the bench and bar.

[4] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[5] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

unfair prejudice. *Marcum v. Adventist Health System / West*, 345 Or 237, 243, 193 P3d 1 (2008). "In applying OEC 401, 702, and 403, the court must identify and evaluate the probative value of the proffered scientific evidence, consider how that evidence might impair rather than help the trier of fact, and decide whether truthfinding is better served by admission or exclusion." *State v. O'Key*, 321 Or 285, 299, 899 P2d 663 (1995) (footnote omitted). When ruling on the admissibility of scientific evidence, trial courts function as "gatekeepers," screening proffered evidence to determine whether it will legitimately assist the trier of fact. *Id.* at 303. The Supreme Court has explained that a trial court's gatekeeping role is important because of the persuasive power of scientific evidence:

> "Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert."

*Id.* at 291 (footnote omitted).

■ To assist courts in performing their "gatekeeper's function," the Supreme Court has identified seven factors to consider:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417. In addition to those factors, the Supreme Court has identified 11 other considerations:

"(1)   The potential error rate in using the technique;

"(2)   The existence and maintenance of standards governing its use;

"(3)   Presence of safeguards in the characteristics of the technique;

"(4)   Analogy to other scientific techniques whose results are admissible;

"(5)   The extent to which the technique has been accepted by scientists in the field involved;

"(6)   The nature and breadth of the inference adduced;

"(7)   The clarity and simplicity with which the technique can be described and its results explained;

"(8)   The extent to which the basic data are verifiable by the court and jury;

"(9)   The availability of other experts to test and evaluate the technique;

"(10)  The probative significance of the evidence in the circumstances of the case; and

"(11)  The care with which the technique was employed in the case."

*Marcum*, 345 Or at 244 n 7. Those factors and considerations are not exclusive, and a particular factor's existence or non-existence need not enter into the admissibility analysis. *Jennings*, 331 Or at 302-03. Ultimately, the reliability of Dietrich's testimony for admissibility purposes under Oregon law depends on an evaluation of its scientific validity. *Id.* at 304.

After analyzing the issue under the above legal principles, we agree with defendants that the trial court did not err in excluding Dietrich's testimony. While IHC testing is generally accepted in some contexts, plaintiff failed to demonstrate that IHC testing is generally accepted for the purpose of testing for microcystins in human liver tissue. Indeed, Dietrich admitted, "To my knowledge, this is the first time that immunohistochemistry has been used on liver sections in humans." Second, there is no known error rate in the tests performed by Dietrich. Each set of tests produced at least one

false result. Third, there are no peer-reviewed publications regarding IHC testing of human liver tissues for microcystins by which the accuracy of Dietrich's tests can be assessed, nor are there established standards identifying specific antibodies and dilution ratios for those tests. Finally, the probative significance of the evidence in the circumstances of the case—that decedent died from microcystin poisoning—is central to plaintiff's claim, and Dietrich's testimony, if admissible, could be highly persuasive to a jury.

■ We are mindful of plaintiff's argument that novelty does not automatically make the evidence inadmissible. We agree that, if a hypothesis is otherwise scientifically valid, a novel conclusion is admissible. *O'Key*, 321 Or at 302. Such was the case in *Jennings*, where the expert's novel hypothesis was based on 45-50 clinical examinations of women with silicone breast implants. The court observed that "[a]ny scientist can check [the expert's] testing method and the clinical history of each of his patients" as well as perform tests of other women with silicone breast implants to discern whether they had the same neurological conditions identified by the expert. *Jennings*, 331 Or at 307.

The evidence in this case presents a stark contrast to the evidence in *Jennings*. The decedent's tissue tested by Dietrich was embedded with paraffin and tested without the benefit of a standard dilution ratio. Because of those facts, the testing of decedent's tissue samples could not be easily duplicated, nor could the test results be subjected to confirmation by other forms of scientifically acknowledged tests for liver toxins. In comparison to the evidence in *Jennings*, Dietrich's opinion is based on three tests, all of which contained false positives. Under the circumstances, we conclude that the trial court, in the exercise of its gatekeeper function, did not err as a matter of law in excluding Dietrich's testimony.

Affirmed.