Argued and submitted November 25, 1997, reversed and remanded February 11,
petition for review allowed June 30, 1998 (327 Or 317)

Nancy R. JENNINGS,
*Appellant,*

*v.*

BAXTER HEALTHCARE CORPORATION,
a Delaware corporation;
and Baxter International, Inc.,
a Delaware corporation,
*Respondents,*

*and*

DOW CORNING CORPORATION
and Willamette Falls Hospital,
*Defendants.*

(9405-03148; CA A92690)

954 P2d 829

Linda K. Eyerman argued the cause for appellant. With her on the briefs were Kathryn H. Clarke and Gaylord & Eyerman, P.C.

Thomas M. Peterson argued the cause for respondents. With him on the briefs were Marilyn Fisher, Brobeck, Phleger & Harrison LLP and Jonathan M. Hoffman, Julie K. Bolt and Martin, Bischoff, Templeton, Langslet & Hoffman.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Plaintiff appeals from a defense verdict in this products liability action. She alleges that she was exposed to silicone from breast implants that leaked and ruptured, causing her personal injuries. On appeal, plaintiff makes multiple assignments of error. We reverse and remand for a new trial.

In 1978, plaintiff, then age 51, received silicone gel breast implants following bilateral mastectomies. Subsequently, one implant partially deflated and was replaced in 1980. The other implant partially deflated after a mammogram was performed in 1992. In 1993, plaintiff had surgery to remove the implants. This action was filed in 1994. Plaintiff alleges that silicone migrated throughout her body from the implants, causing her personal injury.[1] Defendant maintains that plaintiff's condition and symptoms are caused by fibromyalgia.[2]

The breast implants were manufactured and sold by Heyer-Schulte, a division of American Hospital Supply Corporation (AHSC). Subsequently, AHSC merged into the Baxter Healthcare Corporation and Baxter International, Inc. (collectively referred to as Baxter) in 1984. Dow Corning

---

[1] Specifically, plaintiff alleges:

"23.

"As a direct result of silicone exposure from her silicone gel breast implants, Plaintiff has suffered severe and permanent injuries including silicone invasion of her tissue and cells, migration of silicone particles through her body, local and systemic inflammatory reactions, impairment of the immune system, neurological disease, and damage to her inner ear and vestibular system.

"24.

"These injuries have caused Plaintiff physical and mental pain and suffering associated with surgical removal of her silicone gel breast implants, itching breasts, aching joints and muscles, fatigue, dry eyes and mouth, skin changes, memory loss, sleep disturbance, hearing loss, dizziness and balance problems, numbness in the extremities, increased susceptibility to disease, emotional distress including anxiety, nervousness, irritability, fear of future injury and/or death * * *."

[2] Defendant's expert, Dr. Anthony Monanaro, diagnosed plaintiff with "fibromyalgia." He explained that "[f]ibromyalgia is what we call a generalized pain condition * * * marked by generalized aching. It's not just localized, but tends to be aching all over."

supplied Heyer-Schulte with the silicone material. The mammogram was performed by Willamette Falls Hospital. Plaintiff originally brought claims against Baxter, Dow Corning, and Willamette Falls Hospital; however, before trial, Dow Corning and Willamette Falls Hospital were dismissed from the case.

Plaintiff's claims against Baxter are based on strict liability and negligence. The complaint also included a fraud claim, which plaintiff dismissed during trial. Plaintiff alleges that her breast implants were defectively designed, because they were subject to leaking and/or rupture. Further, plaintiff alleges that Baxter was negligent in selling the implants when it knew or should have known of the defects and when it sold them without adequate warnings.

During trial, plaintiff sought to introduce testimony of Dr. Robert Grimm, a medical doctor and board-certified neurologist, as to the cause of her neurological injuries. At the beginning of the trial, Baxter moved *in limine* to exclude Grimm's testimony "regarding any alleged causal connection between plaintiff's silicone breast implants and her purported symptoms pursuant to OEC 104(a), 401, 702, and 403." In essence, Baxter argued that there was no proof of general causation that silicone can cause the injuries alleged by plaintiff, and thus, Grimm's diagnosis of plaintiff's condition also should be excluded. The court ruled for Baxter. It reasoned:

> "He can say 'I've seen a very strong correlation, and at this point, my belief is that it's silicone-related, these two little symptoms.' That, I think we can get there. I'm not sure, but I think we can get there all right.

> "I'm just afraid that saying the word 'cause' links it invariably to a disease that hasn't been established, and that's what I'm concerned about.

> "* * * * *

> "* * * I don't mind getting the fact in front of the jury that I just mentioned, that small-level [of a correlation], and they can draw whatever inferences you argue to them or what they draw on their own.

"What I don't want to have happened is placed for them as a fact, by way of opinion, that based on the preliminary methods and the preliminary work that Dr. Grimm has done so far, he's in it the Nobel Prize, and discovered a new disease and she has it.

"There may come someday where there are established epidemiological studies and enough experts that can tie this [sic] and somebody can say it's a cause."

At the heart of the trial court's ruling is the assertion that Grimm did not have an adequate scientific basis for his opinion on causation and, thus, the testimony would not be helpful under OEC 702. *See State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995) (explaining that "[t]he function of the court is to ensure that the persuasive appeal [of the expert] is legitimate").

Plaintiff assigns error to the court's ruling and argues that Grimm's opinion as to medical causation is supported by his clinical experience, the medical research of others and the application of an accepted medical methodology to his patient's medical symptoms and that the trial court erred under OEC 401 and OEC 702 when it excluded his opinion.

OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

Baxter contends that there is no scientific evidence that exposure of human tissue to silicone causes systemic diseases or the kind of symptoms alleged by plaintiff. In *O'Key*, the court said, "Whenever a litigant claims that a particular scientific technique or theory is valid, that claim is a hypothesis requiring empirical verification." 321 Or at 292-93. Thus,

Grimm's assertion in this case that plaintiff's conditions were caused by silicone that leaked from her implants and migrated to other parts of her body must be supported by the general proposition that exposure to silicone causes the kinds of complaints alleged. For that assertion to be admissible opinion evidence, it must be derived from scientific methodology. "The scientific method is a validation technique, consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses." *Id.* at 292. Baxter argues that Grimm did not use scientific methodologies to reach his opinion. Specifically, it contends that Grimm's opinion is based on a differential diagnoses approach[3] as the basis for his opinion and that that approach is not scientifically valid in this case because it assumes that silicone is a possible cause of systemic disease or symptoms when that fact has not been established.

In light of that argument, we turn to the evidence before the trial court. Grimm's qualifications as an expert witness on the subject of neurology are not disputed by Baxter. Grimm testified that he began studying the effects of silicone in the body in 1993, after seeing two very sick patients. He reviewed the published literature on silicone-related subjects and internal industry documents, including 22 years of animal studies by Dow Corning. He also conducted detailed neurological evaluations on about 50 patients with silicone exposure from breast implants. Grimm testified how he conducted the neurological examinations:

"And so what I did was two things: Just a classic neurologic examination. I made as careful maps as I could of their sensory losses, and I would do this with pins and brushes, with their eyes closed, going back and forth and making marks on their skin, in exactly what areas of hands or a foot it could not be—where the reception was down. And I would do this in various ways to test the veracity of the patients.

"Secondly, because we have a world-class laboratory of vestibular function that I've worked with for about ten

---

[3] A differential diagnosis technique is a systematic approach taught in medical schools and is a generally accepted method of diagnosing the cause of medical conditions. It requires the physician to propose all possible causes of the symptoms and then to rule out as many as possible in order to reach a conclusion about a particular cause.

years at [Good Samaritan Hospital], I sent them system-atically to this laboratory for a full-range look at inner ear function as objectively measured. And this is a laboratory that does the NASA standards work on the inner ear * * * so that I got some laboratory support on there to confirm their vestibular problems.

"Then I myself, then, pursued where I thought was appropriate conduction velocities of local tensile testing, sometimes MRI scans * * * to my great surprise, most of my conduction data was perfectly normal; that is, the person would show up with normal showing in the hands and feet. And I would do the routine studies that we all do, and I could not demonstrate anything wrong with the patch of nerve that I was studying, which meant that their sensory changes were coming from somewhere else.

"So in this initial study, I found this rather astounding correlation between two rather unexpected things, and that began my—began my observations on this silicone-related association phenomenon."

Grimm explained that the error rate in a neurological exam-ination is generally considered to be about five to seven percent.

Among these patients, Grimm found that 95 percent had two neurologic symptoms in common: inner ear dysfunc-tion and a loss of sensation in the extremities. He testified that the combination of symptoms presented a "unique pat-tern" that he had not seen previously in his medical practice. He also explained he restricted his study to women who all had multiple breast implants in place for a number of years and that the only thing that they had in common was that they had all been exposed to silicone. He said that the pat-terns he saw in the women were distinguishable from a cross-section of the population at large. Grimm also performed dif-ferential diagnoses on each of the patients to rule out other potential causes of the symptoms.

Based on those experiences and information, Grimm was prepared to testify that, to a reasonable scientific probability, silicone-related neurological conditions exist in patients who exhibit the kind of symptoms that plaintiff dis-plays. Grimm concluded that

"there's unquestionably a very strong correlation. What I don't understand is the mechanism yet. That, I'm working on. I cannot say that I have got to that point in my work, that I understand the mechanism. It's unquestionable about the association in these patients with their unusual neurological picture."

The issue is whether the trial court erred as a matter of law under OEC 401 and OEC 702 when it excluded Grimm's opinion about causation from evidence. *See State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984). In *Brown*, the court said that when applying OEC 401 and OEC 702 to determine whether novel scientific evidence is admissible, a trial court must consider the following nonexclusive factors:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert." *Brown*, 297 Or at 417.

The court further explained that "[t]he existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so." *Id*. They are to be used to help the court to determine whether the *methodology* underlying the scientific evidence is sufficiently reliable. Moreover, the *Brown* factors focus on whether scientific evidence has a level of reliability sufficient for it to have probative value and are *not* to be used to determine whether "the evidence reflects or rests on a certain or indisputably correct scientific proposition." *Boger v. Norris & Stevens, Inc.*, 109 Or App 90, 93, 818 P2d 947 (1991), *rev den* 312 Or 588 (1992).

■ Thus, pursuant to OEC 104(1), the trial judge must decide whether the proffered evidence satisfies the minimum threshold of logical relevance required by OEC 401. OEC 401 requires a very low threshold of relevance. "Evidence that

increases, even slightly, the probability of the existence of a material fact is relevant evidence." *State v. Lyons*, 324 Or 256, 270, 924 P2d 802 (1996) (citations omitted). The *Brown* factors are analyzed in the light of those evidentiary rules in reaching the ultimate decision about whether the proffered opinion will be "helpful" under OEC 702.

■ We conclude that the trial court erred when it excluded Grimm's testimony about causation. Grimm's qualifications to determine the cause of neurological deficits in patients in general is not questioned by Baxter. Although Grimm's hypothesis (the exposure of human tissue to silicone produces neurological injuries) appears to be novel, it is based on his own experiences and observations as well as on scientific methodology. The hypothesis was tested by Grimm's evaluation of 50 patients who exhibited unique symptoms and conditions similar to plaintiff's and who all had been exposed to silicone from breast implants. He conducted those evaluations by using neurological examination techniques generally accepted by the medical field and with an error rate of five to seven percent. He eliminated other potential causes through differential diagnoses, another generally accepted form of scientific methodology used in medical treatment. He also considered the research of others on animals. Based on an evaluation of all of the empirical evidence, he drew a conclusion from the data that is logically relevant.

Baxter argues that, because Grimm's study has not been published or subjected to peer review, it lacks general acceptance. It also contends that the 50 women that Grimm studied is a biased sample and it points out that Grimm admits that he as yet does not understand the mechanism that he believes produces the silicone-related neurological harm. In our view, those arguments miss the proper focus under OEC 702. The proper focus is whether Grimm has a basis for his hypotheses that depends on relevant, empirical data derived from scientific methodology. Although a differential diagnosis under these facts assumes that silicone is a possible cause, that assumption is logically supported by the unique symptoms and neurological patterns displayed by the women that were examined. All of the women evaluated had been exposed to silicone through breast implants. Moreover,

OEC 702 does not preclude the admission of novel scientific evidence. To accept defendant's proposal would effectively exclude that kind of evidence. As explained above, plaintiff does not have to meet every *Brown* factor, nor does Grimm have to understand the mechanism of how the silicone causes the conditions or symptoms as a predicate to the admissibility of his conclusion. There are many generally accepted hypotheses in science where the mechanism of cause and effect is not understood.

Finally, the evidence would have been helpful to the jury. Medical causation in this case is a complex question, and each side was entitled to offer expert testimony on that issue. There is nothing in Grimm's excluded testimony that would have caused unfair prejudice, confusion or have misled the jury. Whether Grimm's hypothesis is correct was a question of fact for the jury to decide in connection with the other evidence on the issue. In sum, we hold that Grimm's opinions meet the threshold requirement of logical relevance and that Baxter's arguments go to the weight of the evidence and not to its admissibility. We conclude that the trial court erred when it excluded Grimm's opinion on causation.

■■ The next question is whether the trial court's erroneous ruling regarding Grimm's testimony requires reversal. "Evidential error is not presumed to be prejudicial." OEC 103(1). "Nonetheless, prejudicial error occurs if the excluded evidence has some likelihood of affecting the jury's result." *Cunningham v. Montgomery*, 143 Or App 171, 181, 921 P2d 1355, *rev den* 324 Or 487 (1996). Baxter argues that the exclusion of Grimm's testimony was harmless because plaintiff called Dr. Silverman, a board certified rheumatologist and immunologist, to testify "at length on the subject of conditions caused by silicone." Baxter also points out that Silverman specifically testified that plaintiff has a silicone-related disorder.

However, Silverman offered no evidence regarding plaintiff's neurological disorders. As to that subject, he explained that he had relied on Grimm's expertise to conclude whether or not the neurological findings regarding plaintiff had occurred as a result of a silicone-related disorder. Silverman also explained during the motion *in limine*

that his diagnosis of plaintiff depended on a combination of her symptoms. He testified that it was the combination of her neurological conditions in addition to her fatigue, muscle aches and dry eyes that has led him to conclude that plaintiff has a silicone-related disorder. He also stated that "[o]ne of the points here is if you looked at the rheumatological [fatigue and muscle aches] without the neurological, parts of it might be explained by fibromyalgia." Thus, without Grimm's testimony as to the causation for the neurological disorders, plaintiff may have been unable to effectively rebut Baxter's theory of the case that she suffered from fibromyalgia.

In summary, the issue of causation was strongly contested throughout the trial with experts differing about whether the silicone that leaked from the implants was capable of causing plaintiff's complaints. The trial court's ruling effectively prevented plaintiff from offering testimony from a key witness about the issue of causation and that ruling may have affected the jury's view of the rest of plaintiff's evidence in light of the requirement that plaintiff had to prove her allegations by a preponderance of the evidence. On this record, we cannot say that there is "little likelihood" that the trial court's ruling affected plaintiff's case, and we conclude that a new trial is necessary.

Many of the remaining assignments of error may not arise on retrial, and, therefore, we do not address them. However, a discussion of two of the remaining assignments of error could be instructive to the parties on remand. In that light, we turn to the trial court's refusal to admit opinion evidence from Dr. Alexander about the biocompatibility of silicone gel breast implants with human tissue. Plaintiff identifies the trial court's ruling as follows:

"I'm going to allow him to testify as to how the material reacts and reacts with the tissue * * * to the moment he starts telling us how the tissue itself reacts. Then he's into an area that he's not an expert on and won't be able to testify on. So there we are.

"So I don't have any problem with him testifying that he has observed lymph nodes in various types of implants—not just gel, but other types of materials that have somehow

broken down small enough to be accepted into a cell and transported, but to say it happened in this case or there's a reasonable probability sounds to me at this point as being pure speculation.

"I'm just personally uncomfortable with him testifying to a reasonable scientific probability, if that's what was going to happen, that this tissue slide or any of these tissue slides indicate to him, as a biomaterials engineer, that these things migrated through the lymph system and * * * there is a reasonable probability they were outside the capsule. Somebody else may be able to do that, but I'm just uncomfortable with a biomaterials engineer saying that."

In particular, plaintiff argues on appeal that

"Dr. Alexander was *not* allowed to provide, or explain, his opinion that silicone had probably been transported (migrated) via phagocytes or other means in Nancy Jennings' case. He was *not* allowed to explain to the jury the significance of the tissue reaction which he saw, and the significance of silicone migration—that is, that these reactions indicate to him as a biomaterials engineer that silicone is not biocompatible." (Emphasis in original.)

Plaintiff characterizes the trial court's ruling as preventing Alexander from rendering two separate opinions. One opinion deals with whether, in general, silicone in one part of the human body migrates to another part, and the other addresses whether silicone migration occurred in plaintiff. As a preliminary issue, we note that OEC 702 reflects the view that an expert witness on a medical subject need not be a person licensed to practice medicine. *Cunningham*, 143 Or App at 177. As to Alexander's opinion about silicone migration in general, the trial court did eventually permit Alexander to testify about the subject. Alexander testified before the jury:

"Well, there are essentially two mechanisms. One is if a small-enough globule gets into a cell, gets phagocytized by a cell, taken into a cell, it can be transported elsewhere by that cell or the cell can make an effort to destroy it. And the second mechanism is that the very low molecular-weight components of the material can diffuse through tissue. So there are parts of it that will just diffuse through and travel through the tissue, and there are other parts that can be

taken in by cells and transported into the lymph system and into the bloodstream."

As to Alexander's testimony regarding silicone migration in plaintiff, the following dialogue occurred during the trial:

"[Plaintiff's counsel:]  Based on your knowledge of the material and your examination of the breast implants and of the tissue slides in [plaintiff's] case, do you have an opinion to a reasonable scientific probability whether gel migration beyond the fibrous capsule occurred in [plaintiff's] case?

"[Baxter's counsel:]  I'll object to that; medical opinion.

"[The court:]  As long as he's not testifying as to any reaction to the cells themselves or to the tissue. He's just talking about materials migration.

"[Baxter's counsel:]  The only way it can move is through the cells in some fashion or through the bloodstream in some fashion, and we're talking about medicine. There is no evidence of the presence of silicone outside the capsule in [plaintiff]. There's no foundation.

"[The court:]  Well, you'll have a chance to prove that.

"*Overruled.*

"[Alexander:]  Well, there were no tissue specimens taken from [plaintiff] other than the capsule, so—And it wouldn't be appropriate to be removing lymph nodes from her and taking biopsies from her various organs to find out if there's gel there, because that would do her harm. So there is no absolute evidence that the gel is there.

"However, as I said, in the literature in other cases where such specimens have been taken and in animal experiments, the gel does go beyond—

"[Baxter's counsel:]  I'll object to other situations without—

"[The court:]  Sustained. Sustained." (Emphasis supplied.)

In other words, the trial court's ruling did not prevent Alexander from testifying to silicone migration in plaintiff; it only prohibited Alexander from testifying to migration in other cases. Our review of the record does not disclose and plaintiff

does not point to any testimony where she subsequently elicited an answer from Alexander in response to the question initially ruled on by the court.

Also, in this assignment of error, plaintiff focuses on a different statement made by the trial court, which she characterizes as a ruling:

"So I don't have any problem with him testifying that he has observed lymph nodes in various types of implants—not just gel, but other types of materials that have somehow broken down small enough to be accepted into a cell and transported, *but to say it happened in this case or there's a reasonable probability sounds to me at this point as being pure speculation.*" (Emphasis supplied.)

The above statement occurred after the trial court had overruled Baxter's objection regarding the specific question by plaintiff regarding silicone migration, and it was made during the middle of a long dialogue between the court and counsel. The trial court ultimately allowed Alexander to testify as to how the silicone migrates generally in cells. Thus, it is not clear if the statement by the court constituted its ultimate ruling. Even assuming that the statement constitutes a ruling of the court, plaintiff never made an offer of proof as to what Alexander would have said regarding silicone migration *in plaintiff*, insofar as we can discern from the record.[4] *See* OEC 103(1)(b). Finally, we note that the admissibility of opinion evidence about silicone migration is subject to OEC 401, OEC 702 and the criteria that we have identified previously in this opinion.

■ We next turn to the eighth assignment of error, in which plaintiff assigns as error the trial court's ruling that excluded the testimony of her expert on product warnings. Plaintiff offered the testimony of Dr. Karnes, an expert in human factors engineering and the psychology of warnings, on the standard of care and the duties of manufacturers to

---

[4] ORAP 5.45(4) provides, "Each assignment of error shall be clearly and concisely stated under a separate and appropriate heading, must be specific and must set out verbatim the pertinent portions of the record, if it relates to a specific ruling that is being challenged." It is critical to proper appellate review that the precise rulings of the trial court be identified with transcript references so that an assignment of error can be analyzed in context with the trial court's ruling.

provide adequate warnings about the dangers of their products. In her complaint, plaintiff alleges that "[t]he breast implants lacked adequate warnings to apprise *the medical community*." (Emphasis supplied.) Baxter moved *in limine* to exclude Karnes' testimony because the warnings in this case were directed to physicians and Karnes was not an expert on the adequacy of warnings sent to physicians. Rather, his opinion was confined to the adequacy of warnings directed to consumers. The trial court ruled Karnes' testimony inadmissible because it went beyond the scope of Karnes' expertise and also reasoned that the adequacy of a warning is a matter of common sense and does not require expert testimony. In light of plaintiff's pleading, the trial court did not err. However, we note again that OEC 702 contemplates the admission of opinion evidence that could be helpful to the trier of fact. *See, e.g., Brown v. Boise-Cascade Corp.*, 150 Or App 391, 417, 946 P2d 324 (1997) (holding that the trial court erred in excluding expert opinion testimony regarding the adequacy of lighting in a workplace).

We now turn to Baxter's cross-assignment of error. Baxter contends that the trial court erred in admitting the opinions of Silverman in which he testified that silicone causes health disorders and plaintiff suffers from such a disorder. It argues that Silverman's testimony did not meet the burden for establishing the admissibility of scientific evidence. We review the evidence to determine whether, as a matter of law, the trial court erred under OEC 401 and OEC 702 when it admitted Silverman's testimony in those regards. *Brown*, 297 Or at 417 n 4.

Silverman based his opinions on his own clinical experience and the knowledge that he acquired though his participation with a group that studied the issue of causation. At the motion *in limine* hearing, Silverman testified about the scientific methodology for developing a base of knowledge about a new disorder, disease or condition:

> "I think as a clinician research, we have to go in steps. And you have to start by first seeing one patient * * * that raises a questions [*sic*]. * * * And then as one begins to see more patients that are like that, one begins to raise more questions and begins to look and draw on other people. * * *

"* * * * *

"What we do is we constantly do observations in single patients, then if we see it again with more of [*sic*] one patients, it's a case series, and then we go over and ask colleagues, are they seeing it as well. And then we may go to national bodies that have seen that's correct and we've tried to make some recommendations, and now we've established a registry to look for patients that have that kind of illness. * * *

"* * * * *

"* * * Epidemiology studies are usually the end after the harm has been done. What we have to do is we have to kind of start off by first observing so we know what questions to ask."

Silverman then testified about his personal experience with his own patients. He explained that when making his observations, he uses a differential diagnosis to "look at signs, symptoms, and laboratory abnormalities, and compare the individual patient to known diagnoses." Then,

"When I first began to—begin to have sufficient clinical experience that I myself could make some hypotheses about what I observed, I too, just like I described, began to contact other physicians."

Silverman also explained that there is now a formal process for sharing and collecting information for women who have been exposed to silicone. He testified:

"Approximately two years ago, a group of rheumatology physicians, physicians who are specialist in arthritis, bones, muscles, et cetera, who are also certified in internal medicine, began to get together. In fact, that group first actually published an issue in Seminars in Arthritis and Rheumatism, which was a series of articles based on what each of them had individually seen. That formed the nidus, or the beginning for a national group, which is called the Silicone-Related Disorder Study Group, or SRDSG.

"* * * * *

"It began approximately as 20, 25 rheumatologists who met in '94 in New Orleans. And they began to talk to each other and give information, because some of the members had different information in terms of laboratory tests, for

example, and there was a lot of interchange. It was a way to network. They get information from other physicians. And this group began to develop ties between members in terms of research, in terms of understanding of clinical concepts. There was a lot of sharing at that first meeting.

"The group met again this year, in '95, but now had emerged a—a growing interest, not only in rheumatologists, but in other physicians, about what they were seeing."

Under the auspices of SRDSG, a panel of experts was selected to meet as a "Delphic" Panel.[5] The panel concluded that there exists both local and systemic silicone-related disorders with acute, subacute and chronic manifestations. The panel's findings corroborate Silverman's opinions about the existence of a silicone-related disorder. The panel also concluded that in order to be able to diagnosis a silicone-related disorder, a physician needs complete information about a patient, including the patient's history and symptoms as determined by a physical examination, laboratory studies and environmental information, including a history of breast implantation and explanation.

■ We conclude that the trial court properly admitted Silverman's testimony under OEC 401 and OEC 702. Silverman's qualifications as an immunologist are not questioned by Baxter. Silverman's hypothesis that a silicone-related disorder exists is based on scientific methodologies that are in accordance with the general processes of how physicians undertake to identify new diseases or disorders. Finally, Silverman's hypothesis regarding silicone-related disorder has been accepted by a panel of his peers. The panel uses a scientific approach to develop conclusions about the existence of new disorders, diseases, and conditions. In light of the above evidence, we conclude that the trial court did not err

[5] A "Delphic" Panel, according to Silverman, is a method in which a panel of experts makes statements representing the conclusions of groups of experts. The panel is chosen by using set criteria and there is an established process in which the panel proceeds to develop consensus statements. Silverman explained that the process is a scientific method of developing a series of statements that represent the consensus of the group. He explained, "It's an acceptable way of handling, when you don't have all the data that you have, but you have to involve some degree of likelihood."

when it allowed Silverman to testify that silicone-related disorders exist and that plaintiff suffers from such a disorder.

Reversed and remanded.